## GRIFFITH and others *vs.* REED & DIXSON.

A *bill of exchange* imports that a debt is due from the *drawee* to the *drawer,* which is assigned to the payee of the bill ; and if the *drawee* accepts it, is an acknowledgment on his part that *he has funds of the drawer* in his hands to the amount of the bill. When the bill is paid and taken up by the drawee, it ceases to be obligatory upon any of the parties.

The *presumption* that the drawer has funds in the hands of the drawee, may be rebutted ; the drawee may show that he accepted and paid the bill *for the accommodation of the drawer,* and then in the absence of any express stipulation, the law will imply an undertaking on the part of the drawer to indemnify the acceptor, who, *on this implied obligation* may have an action against the drawer—*but not on the bill itself.*

Where a bill is drawn by one person upon another, and a third party subscribes his name under that of the drawer, adding the word *surety* to his signature, the undertaking of such third party *is with the payee or subsequent holder,* that the bill shall be *accepted* and *paid ;* but he incurs no obligation whatever, either *express or implied,* to the *drawees.*

MOTION to set aside report of referees. The declaration contained the common money counts. The suit was commenced by declaration, which was served on the defendant, *Reed,* only. The plaintiffs are commission merchants in the city of New York. The defendant, *Dixson,* in the fall of 1835 and the year following, resided at Richmond, Ontario county, and was largely engaged in manufacturing flour, which was sent to, and sold by the plaintiffs, in New York. From time to time *Dixson* drew bills on the plaintiffs to a large amount, which the plaintiffs, as they alleged, paid and took up, without having funds belonging to Dixson in their hands. On several of the bills *Reed* was a joint drawer with Dixson, *as his surety.* There were other bills drawn by Dixson, with other individuals *as his sureties,* against whom also actions were brought. In this case, the plaintiffs gave in evidence two bills, both substantially alike, though of different dates, one of which was as follows : " W. Richmond, 25th April, 1836. $2000. Three months after date, please to pay to the order of H. K. Sanger, Esq. cashier, two thousand dollars, for value rec'd, and charge to ac. of your ob't serv't. (Signed) John Dixson. John F. Reed, *surety.* To Messrs. E. & J. Griffith & Co. Com. Mer-

chants, New York." *Sanger*, the payee of the bills, was the cashier of the Utica Branch Bank, at Canandaigua. The drafts, on the day they respectively bear date, were discounted by the Branch Bank, for the account of Dixson, and the proceeds paid to him.

As the drafts were from time to time paid, the plaintiffs charged them in their books to *Dixson*. On the part of the defendant, *Reed*, it was insisted that the proceeds of 3224 barrels of flour, amounting to $21,388 16, which the plaintiffs had received and sold, were applicable to the payment of these drafts. This would satisfy all the drafts signed by the sureties of Dixson. The plaintiffs insisted that the proceeds of the flour in question belonged to, and had been paid over to the house of *H. & D. Griffith & Co.* of Rochester. On this and other controverted questions of fact, it is unnecessary to set forth the evidence. If the facts were as the plaintiffs alleged, the defendant, *Reed*, still insisted that, having signed as a *surety* for Dixson, he was not liable *in this action*. The referees thought otherwise, and reported in favor of the plaintiffs.

*A. Worden*, for defendant.

*O. Hastings & M. T. Reynolds*, for plaintiffs.

*By the Court*, BRONSON, J. If we assume that the plaintiffs are right on all the controverted questions of fact in the case, they must still fail in their action. If they were in truth accommodation acceptors and had no funds applicable to the payment of these bills, their remedy is against Dixson, the *principal*, for whose accommodation they accepted; and not against Reed the *surety*.

As an original question, it would, perhaps, be well that a man should never be allowed to become a party to commercial paper as a *surety*—or rather, that his character of surety should be wholly disregarded. But it is quite too late to agitate that question in this state. It has been long settled that a man may become a party to a promissory note or bill of exchange as a surety, and that he is entitled to all the privileges applicable to that character, as fully as though he

were surety in a different form of contract. *Pain* v. *Packard*, 13 Johns. R. 174. *King* v. *Baldwin*, 17 id. 384. *Manchester Iron Co.* v. *Sweeting*, 10 Wendell, 162. *Huffman* v. *Hulbert*, 13 id. 375. *Harris* v. *Warner*, id. 401. These remarks do not apply to an endorser; for though he is in the nature of a surety, he is not for all purposes entitled to that character. *Trimble* v. *Thorn*, 16 Johns. R. 152. *Beardsley* v. *Warner*, 6 Wendell, 610. *S. C.* in error, 8 id. 194. When it does not appear on the face of the paper that the party is a surety, notice of the character in which he contracted must of course be brought home to the holder before he can be affected by it. In this case the character in which Reed contracted appeared on the face of the bill, and every one into whose hands it came was bound to know that Dixson was the principal, and Reed his surety.

Although the relation of principal and surety between the joint drawers could not affect the ordinary rights and remedies of the holder, yet, under certain circumstances, the surety might be discharged, although the principal should remain liable. If, for example, the bill had been protested for non-payment, the holder could not safely treat with Dixson in any way which should prejudice Reed; and if the holder, after a request to enforce his remedy against the principal while he was able to pay, should neglect to do so until he became insolvent, the surety would be discharged. This doctrine will be found in the cases already cited.

To understand the effect which the relation of principal and surety between the drawers will have upon the acceptors, it will be proper to consider very briefly the nature and office of a bill of exchange.

A bill of exchange imports that a debt is due from the drawee to the drawer, which is assigned to the payee of the bill; and if the drawee accepts, it is an acknowledgment on his part that he has funds of the drawer in his hands to the amount of the bill. The presumption of funds in the hands of the acceptor is conclusive as between him and every *bona fide* holder of the paper; and it is so strong in favor of the

Griffith v. Reed.

drawer, that when the bill is payable to his own order, he may, like any other holder, maintain an action on the bill against the acceptor. The undertaking of the drawer is, that the bill shall be accepted and paid by the drawee, and on acceptance his undertaking becomes collateral to that of the acceptor, who is then regarded as the principal debtor. The primary resort for payment is to the acceptor, and it is only on his default and after due notice to the drawer, that the latter becomes liable to pay the holder. When the bill is paid and taken up by the drawee, it ceases to be obligatory upon any of the parties; it has performed its office, and is no better than a piece of blank paper, except as the memorial of a past transaction. These principles are so nearly elementary, that I shall only refer to a few cases. *Cruger* v. *Armstrong*, 3 Johns. Cas. 5. *Simmons* v. *Parmenter*, 1 Wils. 185. *Vere* v. *Lewis*, 3 T. R. 182. *Thompson* v. *Morgan*, 3 Campb. 101. *Rayborg* v. *Peyton*, 2 Wheat. 385. Chitty on Bills, Phila. ed. 1826, 1, 182. 2 Stark. Ev. 302, 275.

The presumption that the drawer has funds in the hands of the acceptor may be rebutted. The drawee may show that he accepted `and paid the bill for the accommodation of the drawer; and then, in the absence of any express stipulation, the law will imply an undertaking on the part of the drawer to indemnify the acceptor. On this implied obligation the acceptor may have an action against the drawer, *but not on the bill itself.*" *Young* v. *Hockley*, 2 Wils. 346. *Chilton* v. *Whiffin*, id. 13. Chitty on Bills, 344, 410. Chitty, jun. on Bills, 38, 40. 2 Stark. Ev. 276. As between the drawer and the drawee, the bill is a mere request or direction to pay money; it never speaks, as it does between other parties, the language of contract, or imports any obligation. When the acceptor sues, whether he declares specially on the implied promise to indemnify, or generally for money paid, the bill itself is not the foundation of the action; it is but an item of evidence. So if one man lend his own note to another, and is afterwards obliged to pay and take it up, the law will imply a promise on the part of the borrower to indemnify the maker; but surely, the maker

could not sue the borrower on the note itself. The thing is preposterous. It would be no less absurd to suppose that an accommodation acceptor can maintain an action against the drawer on the bill itself. When a note is paid by the maker, or a bill by the acceptor, its vitality is gone. It ceases to be a binding contract upon any one.

In the case at bar, the plaintiffs have not thought of suing on the bill. They go on an implied assumpsit to refund the money, which they say springs out of the fact that they paid the bill without having funds of the drawers in their hands.

This brings us to an insuperable difficulty in the way of maintaining this action. Reed is a *surety*, and the plaintiffs seek to charge him, not on the contract which he made, but on one which they say may be implied by law. No case was mentioned on the argument, nor do I know of any where the law will imply a promise or obligation against a surety. He is bound by his express contract, and by that only. Had the bill been protested for non-payment, the payee or other holder could treat him as one of the joint drawers, and have a remedy on the bill itself. His undertaking was, as we have already seen, that the bill should be accepted and paid. That was his contract, and he was bound by it. But he made no agreement whatever with the drawees of the bill. See *Douglass* v. *Reynolds*, 7 Peters, 113.

If this seems a narrow view of the question, let us see what was the fair import of the transaction. And first, what was the language of the bill to those who took it? The payee and every other holder, on observing that Reed was a surety, would at once read the bill thus : Dixson is the principal ; it is a debt due to him that the bill purports to transfer ; it is Dixson, and he alone, that has dealings with the drawees. But, for the purpose of inducing us to discount and advance money on the bill, Reed has become the surety of Dixson, and both agree that the bill shall be accepted and paid by the drawees. If not paid, we shall have a remedy against both ; but we must take care not to have any negotiations with the principal which may prejudice the surety.

Griffith v. Reed.

And here I may remark that Reed, as well as every one else, had a right to suppose that Dixson had funds in the hands of the drawees.

What was the language of the bill to the drawees when it was presented to them? They could not but read it thus—Dixson is the principal—he draws on us, and Reed has lent his name as a surety. Dixson agreed with the holder that we should accept and pay, and Reed was a surety for the performance of that contract; he became such surety for the purpose of inducing the payee to discount the bill and advance the money to Dixson. The bill is not drawn on the funds of D. & R., but on the funds of D., the principal. If we pay the bill, we must charge the money to his account. If he has no funds with us, and does not provide them, we must look to him on the implied undertaking to refund the money. Now this is precisely the way in which the plaintiffs did read and reason upon this bill. They had dealings with Dixson—they understood that the bill was drawn on his account, and to him they charged the money. They judged rightly in doing so. The afterthought of bringing this action was, to say the least of it, a mistake.

I have noticed the two facts that Dixson had dealings with the plaintiffs and that they charged the money to his account, for the purpose of showing that they have not been misled. They did not pay the bill under any impression that they could resort to Reed and compel him to refund the money. But I do not consider those facts material in making out a legal defence. When they saw on the face of the bill that one of the joint drawers was a surety for the other, they were bound to know that they accepted and paid for and on account of the principal, and him only.

We were told on the argument that the original theory of a bill of exchange, which supposes funds in the hands of the drawee, is no longer true; but bills are now more commonly drawn without, than with funds; and that our adherence to the old doctrine would shake a multitude of commercial transactions. It is no doubt true that bills are now very commonly drawn for purposes quite wide of their appropriate office, and I think it equally true that this mode

Griffith v. Reed.

of creating credit has led to the most mischievous conse-quences. The evil began to be seen, and felt many years ago. In *Pentum v. Pocock*, 5 Taunt. 192, Mansfield, Ch. J., said, " the paying respect to accommodation bills is not what one would wish to do, seeing the mischiefs arising from them ;" and Heath, J., said, "the courts had gone much too far in lending support to these mischievous instru-ments, the evils resulting from which we see every day." Mr. Chitty, in the 6th edition of his treatise on bills, says— " The pernicious effects of a fabricated credit by the undue use of accommodation bills of exchange, drawn out of the ordinary course of trade, have been too much felt to require any observation ; the use of them where there is no real demand subsisting between the parties, is injurious to the public as well as to the parties concerned in the negotia-tion." P. 4. If he were now to review this opinion. whether standing on this or the other side of the Atlantic. he would find no occasion to question the severity of the judgment which he pronounced in 1822 upon this species of paper. The portentous cloud which at this moment hangs over the whole commercial world, has gathered much of its fearful aspect from the modern practice of fabricating credit by means of bills drawn out of the ordinary course of trade.

There is nothing, then, in the fact that accommodation bills are in common use which should induce us to give them any new sanction. We do not deny their validity. We only adhere to an old and well established rule of law. Although many bills are drawn where there is no real de-mand subsisting between the parties, we cannot presume that such is *always* the case ; and if we could, we cannot impart a new quality or force to the instrument, and make it speak the language of contract as between the drawer and the drawee. We must go this length before the plaintiffs can make out a cause of action against the surety.

Report set aside.