Cowen, J.
This is an action for money paid, laid out and expended for the defendants, on the ground that they have overdrawn upon the plaintiffs. The latter acted, for some time during the years 1838 and 1839, as commission merchants for, and lenders of their credit to, the defendants Norton, Bartle & McNeil, who placed in their hands a bond and mortgage for- $40,000, and stipulated to furnish produce for sale on commission ; both together constituting, with the personal security of Norton, Bartle & McNiel, a fund on which the loans were to be made as their occasions might require. The mode of advancing was by bills of exchange to be drawn on the plaintiffs and accepted and paid by them. The bills were accordingly drawn by Norton, Bartle & McNeil, with the addition to their names of some undersigner as surety. In June, 1839, the plaintiffs sent to the Geneva bank a special letter of credit in favor of Norton, Bartle & McNeil, by which the former proposed to accept for $5000 on bills to that amount, if undersigned by persons whom the bank should consider responsible. Under this letter, and on its credit, the particular bill in question was issued, discounted by the bank, and accepted and paid by the plaintiffs, the defendant Westfall undersigning as surety. The loan was in fact to Norton, Bartle & McNeil—not to Westfall. The account was made by them, the charges booked against them, and the moneys paid to their account at the bank. All the evidence that we have of the extent to which Westfall intended to become bound as *216 surety, arises from his simple act of undersigning. That he knew or ever heard of the letter, upon the credit of which Cook discounted the bill jn question, we have no evidence. He was a farmer residing within a few miles of the borrowers, and undersigned for them on their request. The legal effect of thus drawing was, that, on the plaintiffs refusing to accept or pay, Westfall would be liable to the holder in a suit upon the bill itself; but never to the drawees. Nothing is better settled than that, on a bill of exchange, the acceptors are primarily liable as principals, and the drawers and endorsers collaterally, as a sort of sureties. I speak of the transaction per se. No doubt the acceptors of bills and makers of notes may be mere lenders of their paper. It is every day’s practice that they become so by accepting accommodation paper; but this is not indicated by the paper itself. It arises from matter extrinsic— an agreement by which the ostensible relations of the parties are subverted. The principal thereby becomes aosurety ; and such was the case here as between the plaintiffs and Norton, Bartle & McNeil. It is not to be denied that the relation may be thus changed by the mere fact of overdrawing, where the drawers come for their own benefit, They obtain money in this way which, ex equo et bono, they ought to refund; and such is the fact and the law of this case as against Norton, Bartle & McNeil. They acted with knowledge, and the money was advanced to them. Far different ás to Westfall. Non constat that he was at all made acquainted with the basis on which the parties interested did their business ; nor is it probable that he was. The transactions between them seem to have been founded on the elements that too commonly enter into the credit system, viz. fictitious or colorable funds of the immediate parties, and credulity on the side of the public. No doubt Westfall might have made himself jointly liable with Norton, Bartle &, McNeil for these advances. He might have joined them in an express agreement as guarantor to refund the plaintiffs •, he might have joined them in a counter acceptance or in making a promissory note for the amount. I rather think his *217 liability should be shown in writing. It is collateral, and, if not written, would be open to objection upon the statute of frauds. Take it that Westfall knew Norton, Bartle & McNeil to have been overdrawing, and expressly promised by parol to be their surety, the promise would perhaps be void by the statute of frauds. Suppose him to have seen the letter of credit before he joined them in drawing ; upon what construction could we say that he intended to become liable as surety to the drawees 1 His act, to say the least, would be equivocal; and we have often held of late that where a man puts his name in a position to be charged as endorser on negotiable paper, he cannot be changed into a guarantor by reason of privity to be shown by facts aliunde ; in other words, that, when a man puts his name on negotiable paper, he shall be taken to have bound himself according to the import of what he writes, and cannot, by parol, be subjected to an ulterior obligation. If he puts his name as endorser, he is an endorser only; if as drawer, it would seem to follow that he shall be holden as drawer only by an action on the paper itself. We do not allow the violence of first subverting the intent, and then the statute of frauds, in order to substitute a mere implied for a written promise. We have refused to force a guaranty upon a man when he has told us by his contract that he means something less. But it is not necessary in the instance before us to declare that a drawer, though a surety, with such privity as to know that he is overdrawing, .can escape an implied engagement as guarantor. Here was no privity. It was the simple act of Westfall putting his name to a bill as surety drawer. What does he say ? Precisely what an endorser-says : £<I will pay on default of the principal, and' due notice.” Pay whom? The holder; not surely the drawees who accept, and thereby acknowledge themselves in funds. They would rather be liable to him or his principals ; and if they pay, they do so as in duty bound. They have taken upon themselves the character of principals j and when they call upon him to refund, they make a call beyond his undertaking. He may answer, non hmc in fmdera *218 veni. A holder showing him to' be a drawer, can make him liable as such ; but to the acceptors he never came under any express engagement. They knew that he put his name to the bill as surety; and had no reason to suppose he intended more than to give the bill additional strength and currency at the bank. If they overpaid Norton, Bartle & McNeil, it was more than he knew they ever intended to do, or ever told him of. He never promised and never could promise, therefore, to refund them, either in writing or by parol; nor will the law imply an obligation to repay moneys which a man never received.
It seems to me that in such a case there are no materials out of which a guaranty can be made. I forbear however to pursue this point since our decision in Griffith v. Reed, (21 Wend. 502,) from which the present cannot be distinguished. It was said in argument that there, Reed was a surety on the face of the bill; and it is true that Westfall has not appended the word surety to his name. It is sdmewhat strange that these plaintiffs should ask us to act upon such a distinction. Both they and the bank knew just as well the relation in which Westfall actually stood, as if he had called himself surety; and the plaintiffs have treated him throughout as a mere surety. The only thing material in the distinction is stated by Mr. Justice Bronson in Griffith v. Reed, viz : :c When it does not appear on the face of the paper that the party is a surety, notice of the character in which he contracted must of course be brought home to the holder before he can be affected by it.” The object is, that the party acting on the credit of the name should not be imposed upon by the false or equivocal position which it occupies. What difference could it have made to. these plaintiffs if Westfall had called himself surety 1 They knew that he was no more; and he had been procured to come in as such by their own request to Norton, Bartle & McNeil. Had they intended to claim against him as a guarantor of the loan, it behoved them at least to tell him that his principals wer,e drawing on a fictitious fund, and to take his express engagement to make it good pro tanto„
*219 Having reached the conclusion that the transaction was not of a nature to raise an implied promise by Westfall, the case might properly be disposed of without going into the question of usury. There are reasons, however, why, in this case, the question should not be entirely overlooked. This suit is said to be the pioneer of many which are in contemplation against others occupying the same position as Westfall. The question has been well argued, and, for aught I know, may yet become material to the ulterior disposition of this case, should it be retried. *
No man is entitled to take more than at the rate of seven per cent, per annum for the loan or forbearance of his moneys, goods or things in action •, nor can he adopt any indirect method or device by which more shall be obtained; and all contracts and arrangements by which, directly or indirectly, an attempt is made to secure more than that, are void. (1 R. S. 760, 2d ed.) A loan of credit at a higher rate is one instance ; e. g. a loan of acceptances, (Kent v. Lowen, 1 Camp. 177,) notes, (Dunham v. Dey, 3 John. R. 40, Dunham v. Gould, 16 id. 367, Fanning v. Dunham, 5 John. Ch. R. 122,) or endorsements. (Fanning v. Dunham, id. 122, 134 5 Steele v. Whipple, 21 Wend. 103.) Speaking in Fanning v. Dunham, Chancellor Kent said: u Instead of being a cash advance, it was a loan of his credit to the plaintiff, and attended with the same risk and trouble as if he had loaned the cash.” u In every case in which a note was for four months, for instance, two and half per cent, commissions was more than at the rate of seven per cent., and consequently usurious.” That is the exact case of the acceptance in question. Looking at the loan of credit eo nomine, the law allows no exception. If the party accepting be at the same time retained either generally or specially to do a distinct business, he may be paid for that the accustomed charges; but nothing more on account of the loan. (Com. on Usury, 134.) Thus, a country banker loaning his own notes, may lake the actual difference of exchange for drawing on his funds at the place which forms the standard of *220 exchange. This is a distinct business—remitting and making good the loan at a distant place. It is the Same as if a third person should take the loan in exchange for a bill on the same place. The cases of Hammett v. Yea, (1 Bos. & Pull. 144,) and Masterman v. Cowrie, (3 Camp. 488,) need scarcely be mentioned. In the latter, the whole seems to have been resolvable into work, labor and expense of the plaintiffs, who were bankers, in fixing out a fund on which they could accept for a stranger, without any mention or idea of ever advancing any money or charging interest. For all this they charged a small per centage of 5s. Lord Ellenborough said, “If there be a stipulation for more than five per cent, on a contemplated advance, the agreement is usurious j” though he mentions a possible right to a commission even upon a discount, founded in the collateral expense of procuring specie, keeping clerks and a counting-house, on purpose to accept and pay bills with funds provided by the person for whom the business is done. But it is clear, that if such charges be allowed at all, they are predicable of bankers only. (Vid. per Spencer, J. 13 John. R. 47; Kent, chancellor, 16 id. 374, 5 ; 7 John. Ch. R. 78, 79; Ex parte Jones, 17 Vesey, 332 ; Baynes v. Fry, 15 id. 120; Carstairs v. Stein, 4 Maule & Selw. 192; Sussex Bank v. Baldwin, 2 Harris. N. J. Rep. 487, 497,505.) Ex parte Henson, (1 Mad. Rep. 112,) was the case of a bill broker, and might have been right for the expense of collecting which he usually paid in Londom (Auriol v. Thomas, 2 T. R. 52 ; Campbell v. Shields, 6 Leigh, 517 ; Kent v. Phelps, 2 Day, 483.) Beyond that,it would be more questionable if it had not been the mere discount of a bill in payment of a precedent debt. In Nourse v. Prime, (7 John. Ch. R. 69,76,) the work and labor were easily separable. The charge and allowance was for stock-brokerage merely.
The case of a factor receiving a per centage for his work and labor, and, where he acts on a del credere commission, adding, a per centage for guarantying the price of the goods sold on account of his principal, is quite familiar. No one ever thought *221 of impeaching such addition as usurious. (Vid. M’Culloch's Dict. of Commerce, u Factor.”) He is frequently involved in the execution of very extensive and important trusts, beside incurring heavy' and undefined responsibilities. So long as his compensation has a strict reference to. his duties and responsibilities as factor, it is no more usurious than a compensation to any other servant. It is the case of Palmer v. Baker, (1 Maule & Selw. 56,) where bankers were allowed to take a like compensation for trouble in executing a long trust, it appearing that it had no connection with their advances of money. I have met with no English case which allows a factor to take a commission on his acceptances or advances as such, over and above the legal rate of interest. The case of Trotter v. Curtis, (19 John. R. 160,) would seem, on one construction, to go the length of allowing both a premium on acceptances and interest on consequent advances, the principal having stipulated to kéep his factor in funds by consignments equal to his acceptances ; and it is said, the parties here acted upon that case. But there was no previous stipulation there to pay the commission. The principal had disappointed his factor, who had subsequently charged the commission which the defendant had allowed to him in a course of account for a series of years. The learned chief justice professedly acted on the principle of Palmer v. Baker. He said: “ The judges pláced their determination of the cause on the enquiry, whether the reservation was a motive for the advanbe of the money. If it was, they pronounced it usurious ; but if it were referable to trouble only, then they pronounced the transaction a fair one.” He could not mean trouble in advancing the money; for, as I have noticed, that case went entirely on labor in executing the trust. This labor consisted in clearing an extensive tract of land, and selling and converting the timber into money—a labor of two or three years. In the case at bar, the acceptances were made under a previous agreement for the commission 5. the reservation was a motive for the acceptances. In Trotter v. Curtis, there was some room to intend that the trouble was not the *222 mere advance of the money; while here, the plaintiffs have declared in writing that it was. There is, moreover, another feature which distinguishes this case from that, very widely. The future advances were, by agreement, to be made by the plaintiffs, not in their exclusive character of factors or commission merchants, but also on an exchange of credit, as .in Dunham v. Dey, (13 John. Rep. 40,) and Dunham v. Gould, (16 id. 367.) The plaintiffs took a mortgage from two of the defendants, Bar-tie and McNeil, with a bond to secure $40,000, on the credit of which they agreed to accept to the extent of $20,000; Norton, Battle & McNeil also agreeing to keep them good by consignments of produce to that amount as the pay days of acceptances came round. This was, in terms, a loan of the plain-' tiffs’ credit at two and a half per cent, over and above their claim for interest on the actual advances ultimately to be made. The cross securities were no more than cross notes or cross acceptances ; and a loan of credit on such terms was, in the cases of Dunham v. Dey and Dunham v. Gould, expressly held to be usurious. De Forest v. Strong, (8 Conn. Rep. 513,) strikes me as a misapplication of Trotter v. Curtis. If not, I admit it would go far to sustain the present transaction were- another circumstance out of it.- In the case at bar, no one can doubt that the arrangement was with a view to loans or discounts at the bank. It was a device to raise money there, by first paying the discount at the bank, and two and a half per cent, in addition, to the acceptors. The whole affair took that direction. The limitation to $20,000 and the consignments to meet it, were utterly disregarded. The contract itself looked to a deficiency in produce, and in a little more than one year a balance of acceptances was swelled up to more than $40,000. No one can for a moment suppose that this was a regular commis • sion business. Admitting that a factor may take' an extra premium on his advances, which I do not, yet he must show that he acted strictly within the line of' his agency. The whole must be an unmixed commission business, and the advances made on that basis. The usage given in evidence seems to me *223 entirely inapplicable, as much so as the usage in Dunham v. Dey and Dunham v. Gould. • I see nothing to distinguish the case from Kent v. Lowen, (1 Camp. 177,) wherein Lord Ellenborough told the jury that they were, if they believed ths two and a half per cent, was taken on exchange of securities, hound to find usury. At least, I think the charge should have been as strong as in the case of Dunham v. Dey. Platt, J. there told the jury, that if they believed the transaction to have been for the purpose of raising money at a greater rate of interest than seven per cent, per annum, which they Avere warranted to infer, then such intention made it intrinsically a loan, and the transaction was usurious and void.
I assume that the bill in question was drawn under the agreement of the. plaintiffs, because this was assumed at the trial, and the case put to the jury on the usage of commission merchants.
There was certainly a term, in the contract between the parties, by which Norton, Bartle & McNeil might have avoided the effect of the stipulation to pay the two and a half per cent, I allude to the condition that the commission was to be payable only on acceptances or advances made otherwise than with produce. By making very early and perfectly adequate consignments, thus keeping the plaintiffs clearly in funds from the proceeds, equal to their acceptances and advances, the extra charge might have been put out of the question. Looking, however, at the nature of the fund, and the practical disregard of that condition by both parties, there is scarcely any ground for saying that either of them considered the condition as any thing more than nominal, Drafts and acceptances continued to a very large amount over and above actual consignments, and the original stipulation expressly provided, for such a consequence, There is no pretence for saying that the transaction is like a contract to pay extra interest by way of penalty for default of paying a specific debt at an appointed day; nor was the point made at the trial. Such stipulations are, at best, not to be received with much favor. (Com. on Usury, 80, 81; Plowd. on Usury, 85.) They have been held *224 innocent and even obligatory, when inserted for the obvious purpose of securing prompt payment; Hut never, I believe, when their violation has been expressly, or by secret understanding, looked to by the parties : nor, especially, where they have gone forward increasing the debt upon which the extra allowance was to be made, after the condition has been violated. The strongest cases of this kind in favor of the creditor are, I think, Campbell v. Shields, (6 Leigh, 517, 519 to 522,) and the cases there cited.
On the whole, I think the plaintiffs cannot effectually claim, protection against the imputation of usury, from any of the. adjudged cases.
Nelson, Ch, J. and Bronson, J. were of opinion that, on, the question of usury, the case of Trotter v. Curtis, (19 John., 160,) was decisive in favor of the plaintiffs. In other respects* however, they concurred with Cowen, J.
New trial granted., •