Marvin, J., (dissenting.)
The counsel for the respondent insists that Suydam v. Westfall (2 Denio, 205), decided by the late .Court for the Correction of Errors, is decisive of this case; and the counsel for the .appellant claims that the cases are distinguishable, and that Griffith v. Reed (21 Wend., 502), is precisely in point, and that it was not overruled as»an authority by Suydam v. Wesfall. He states with much care what he claims to be the differing facts and argues that they are such as, upon sound principles, lead to different results. It will be proper to notice these cases. Griffith v. Reed, was decided in 1839, by the Supreme Court, upon the opinion of Bronson, J. The case, in its material circumstances, is precisely like the present case with an exception, not perhaps material, viz.: that it does not appear that there was any previous arrangement between Dixon, the principal • drawer and the plaintiffs, that the latter should accept and pay without funds. The next case is Suydam et al. v. Westfall in the Supreme Court (4 Hill, 211), in which Cowen, J., delivered the opinion. • In this case business relations had existed, commencing in 1838, between Norton, Bartle & McNeil, a firm doing business in Ontario county, and the plaintiffs, commission merchants - in New York, the latter often accepting and paying the time .drafts drawn upon them by the former, under an arrangement not necessary to be noticed here. In June, 1839, the plaintiff required that Norton, Bartle & McNeil, should procure an undersigner upon drafts drawn by them upon the plaintiffs. And the bill in question addressed to the plaintiffs, was drawn payable to the order of one Cook, requesting the plaintiffs to pay and charge to the account of your obedient servants, and signed. “Norton, Bartle & McNeil. Albert Westfall.” It was discounted by Cook, and then accepted and paid by the plaintiffs without funds, and the action was against Norton, *539 Bartle & McNeil, and Westfall, to recover for money paid to their use. The Supreme Court held that Westfall was not liable to the plaintiffs.
The next case in the Supreme Court is Wing v. Terry et al. (5 Hill, 160), in which Bronson, J., delivered the opinion of the court. In this case the like business relations existed Between Terry & • Post, the country manufacturers of flour, and the plaintiff, a commission merchant in Albany. The latter became unwilling to accept further for the former, unless they would get sureties. The time draft in question was made, requesting the plaintiff to pay to “our own order” “and charge the same to the account of your humble servants.” It was signed “Terry & Post,” “Z. W. Gurney, Jotham Post,” and indorsed by them. It was accepted by the plaintiff and paid without funds, and the action was against all the signers of the bill, to recover for money paid. In these cases no change was made by the acceptance in the mode of keeping the account. The court held that there could be no recovery by the plaintiff against Z. W. Gurney and Jotham Post. (Griffith v. Reed and Suydam v. Westfall, supra.)
One of the differences between Suydam v. Westfall and the case under consideration, is, that in the former case the direction to the drawer is to charge to the account of your obedient servants, in the plural; and that in the latter it is charged to “ the account of your obedient servant,” in the singular. The argument is that in Westfall’s case all the signers of the bill directed the' drawer to charge the sum- paid to their account, that is, to the account of all. of them, thus showing that they were all joint drawers, directing that money should be paid for their joint benefit, without regard to any account between Suydam & Co., and Norton, Bartle & McNeil: while, in the case under consideration, the request being, in effect, to charge to the account of Leman B. Garlinghouse, it is clear that no money was or could be paid by the drawers to and for the use of any person other than Leman B. Garlinghouse. No question is or can be made that Westfall was in fact a surety for Norton, Bartle & McNeil, and that Suydam & Go. so knew. *540 I have supposed the difference in the bills, as indicated, arose simply from the fact that, in Westfall’s case, the principals in the making of the bill were two or more persons, and they were the persons who as a firm, had an open account with the drawers, while in the case we are considering, the principal in drawing the bill was a single individual, and the person who had an open account with the drawees in Boston. This suggestion finds support in Griffith v. Reed & Dixon, the case relied upon by the appellant’s counsel. In that case the bill was signed “John Dixon, John F. Reed, surety,” and the ■ direction was, “ charge to the account of your obedient servant,” in the singular number.
No notice of this circumstance is taken by Bronson in his opinion, but he puts the decision upon other principles holding that Beed was not liable, which principles will, in a moment, be noticed. Another- (distinction claimed as material is, that in Westfall’s case it did not appear on the face of the paper that he was a surety, and this so appeared in Seed’s case. It does appear in Westfall’s case that he was surety, and that Suydam & Co. knew this fact, and their knowledge constituted the material question. Judge Bronson says, in Seed’s case, “ when it does not appear on the face of the paper that the, party is a surety, notice of the character in which he contracted must, of course, be brought home to the holder before he can be affected by it. In this case the character in which Beed contracted appeared on the face of the bill, and every one into whose hands it came, was bound to know that Dixon was the principal and Reed his surety.”
It is said by the counsel, that it was assumed by the court in Westfall’s case, that he knew that Norton, Bartle & McNeil did not draw against funds and that great weight was given to those facts. It was so argued that he had such knowledge by one of the judges, from facts common to that case and this case, viz.: that the bill was a time bill, four 'months. In this' case the bill is a two months’ bill. I am not aware, however, that much importance was attached to such fact.
It is also added by the counsel that in this case the defend *541 ant contracted "as a surety, and that the drawers accepted and paid the bill without funds under an agreement between them and Leman B. Garlinghouse, that they should so accept and pay the draft for the accommodation of Leman B. Garlinghouse, and that this precludes the idea that they, gave any credit to the surety. This is the difference between this case and Heed’s case which I noticed above. Here it expressly appears that the bill was accepted and paid without funds under an agreement with Leman B. Garlinghouse. In Beed’s case it does not appear that there was any such previous agreement. But in Westfall’s case a like agreement does appear; that is, Suydam & Co. authorized Horton, Bartle & McHeil to draw upon them at four months, for an amount specified, the drafts to be undersigned by, &c. Here is an implied promise to accept for Horton, Bartle & McHeil upon their obtaining an undersigner, and if they accepted they would be bound to pay; and for whose accommodation was the acceptance to be made and the bills paid, if, when due, the acceptors should be without funds ? Clearly, I submit, for Horton, Bartle & McHeil, and they kept their account with them alone. It does not appear that in that or this case, the sureties had any knowledge of the arrangements previously made between the drawees' and the principals.
It thus appears that this and the Westfall case, are alike in the only circumstance in which this case differs from the Beed case, a circumstance which I regard as immaterial.
I do not think that such arrangement precludes the idea that in fact the drawees in Boston gave any credit to the sureties. It was such a bill as the one here, that they agreed to accept and pay for the accommodation of Garlinghouse. Why require sureties if the sureties were not to be liable'!
Let us now see upon what principles Griffith v. Reed, Suydam v. Westfall, and Wing v. Terry, were decided by the Supreme Court, and then look into Suydam v. Westfall in the Court for the Correction of Errors.
These cases were all decided upon the elementary principles and theories of the nature of the contracts of parties to a bill *542 of exchange, and the office of a bill of exchange. Starting with the position that its office is to transfer money, which the drawer of the bill has in the hands of the drawee, to .another person, viz., the payee who may order it'paid to his indorsee and so on, and following this up with the principle that when the drawee accepts the bill; he becomes at once primarily liable to all the other parties to the bill, into whose hands the bill may come, and that he is not permitted to' deny that he had funds, except in an action by the drawer, against him, and that having paid the bill, its office is fully performed and no action can be maintained upon it by any one—that .after the original office of a bill of exchange became so far perverted that it was sometimes drawn by one, who had no funds in the hands of the drawee, and accepted by the latter, thus making him liable to all bona fide holders—he was allowed, upon payment of the bill, to maintain his action against the drawer, not upon the bill, but for money paid to and for his use.
Such bills were, and are, however, accommodation' bills. Now, as in the cases decided by the Supreme Court, it appeared that certain persons had signed the bills as sureties for the drawer who was to be accommodated, and the fact of surety-ship was known to the drawee, and as such sureties were to have no money paid for their use, it was held that they could not be made liable to the acceptor for money paid, to and for their use. None of the drawers of the bill were liable upon it, for it contained no promise to pay money to any one. It is a direction to pay to another to charge over. It was held that such sureties were liable to the payee or any indorser who paid for the bill, in case the drawee refused to accept, or failed to pay. In short, their liability was that of surety to their principals who drew the bill, and arose upon their express contract, to wit, that the drawee would accept and pay, and that the acceptor, knowing all .the facts, could not resort to them, upon any implied contract to reimburse him for money paid,' for the use of their principal. Those were the principles, in short, upon which the Supreme Court decided the cases. Suydam & Co. v. Westfall was taken to the Court for the Cor *543 rection of Errors and was there reversed. And as I understand, the broad principle was established by the decision in that court, that all persons, signing a bill of exchange, are as to the drawee, drawers and liable to him for money paid for their use, if he accepts and pays the bill without funds: and that this is so though, as between the drawers, some are principals and others their sureties, and this so appears upon the paper, or if not so appearing is known to the drawee. That the payment is to be regarded as made for the use of all the drawers, though it should be directed, by the bill, to be charged to the account of all or one of them, and should be so charged, or paid and charged as contemplated by the parties. In short, the money being paid upon the joint order of all, all are liable to the drawee for such payment without funds, in the same manner as they would be upon a note signed by them, except in the latter case the action would be upon the note, in the former upon the implied promise to repay money paid -at their request, and thus for their use.
In all these cases, those who, as between the drawers of the bill were the principals, received the avails of the bill, and the account of the acceptor was kept exclusively with them. Ho new account was opened. Suppose, in Suydam v. Westfall, Norton, Bartle & McNeil had had ample funds in the hands of Suydam & Co. to pay the bill at maturity, could Suydam & Co. have maintained an action against Horton, Bartle, & McHeil and Westfall, upon the ground that they had no funds in their hands? The answer will be at once, no; and why ? Because Suydam & Co. knew that Westfall was a mere surety. If in. truth' .there had been a firm composed of Norton, Bartle, McNiel and Westfall, and they had drawn the bill as it was drawn, and they at maturity and payment had had no funds in the hands of Suydam & Co., the latter could have maintained the action, though Norton, Bartle & McNeil had had ample funds in their hands. Indeed, they would not, without permission, have been justifiable in appropriating any funds belonging to Norton, Bartle & McNiel, another firm, to the payment of such bill.
*544 In this connection I call attention to Branch & McKenna v. Phillips & Co. et al. (16 Pet., 121.) The plaintiffs were factors and commission merchants, and acted for the defendants, and discounted or received, per agreement, the bills of the latter, for large amounts advanced; in some of which bills Horton and Terry joined as drawers. Other bills were drawn by Phillips & Co. alone. The action was upon bills in which Horton and Terry had joined, and the question of their joint liability with Phillips & Co. was not raised, but it was conceded, all through the courts, unless the bills had been paid by Phillips & Co., and this depended upon a question of appropriation of the proceeds of certain cotton, consigned by Phillips & Co. to the plaintiffs. It was held that the bills were paid. This case shows that the plaintiffs, the drawers, were bound to apply the funds in their hands belonging to the defendants, Phillips & Co., who, as to Horton and Terry, were the principals in mating the bills, to the payment of the bills. And the accounts between the principals were gone into largely and fully, &c., &c., and the question of the liability of Horton and Terry, known to the plaintiffs to be the mere sureties of Phillips & Co., was not raised, a point which, according to the decisions (supra) of our Supreme Court, would have been perfectly fatal, whatever may have been the state of the accounts between the principals. It seems the action was upon the bills, and it does not appear that any question was made as to the form of the action. But to return to Suydam & Co. v. Woodfall, in the Court of Errors. I have noticed the distinction in facts existing between that and the present case, and endeavored to show that they are not material: that the decision goes, and must of necessity have gone, to the extent, I claim. It is said tliat the judges, in their opinions, refer to and comment upon some circumstances in that case which are not in this," and that Griffith v. Reed, is not overruled. I have noticed already most of the differences, and remarked upon them. The differences touching the direction to charge to the account of “ servant” or “servants,” and the adding or not adding “ surety " to the name of the person who was *545 surety in fact, are, I believe, regarded as the' most material. As to overruling Griffith v. Reed, that case was not under review, though Senator Porter cites it as an authority fully sustaining the views expressed by him, and so it does; and it is the only case he cites. His opinion is a dissenting opinion. He was in favor of sustaining the decision of the Supreme Court. Two other opinions were delivered, giving reasons for reversal— one by Senator Bockee, in which he refers to no case except the one then being reviewed. He reasons upon general principles, and quotes from the opinion of Cowes, J., when the case was in the Supreme Court, and uses such quotations as sound law and as aiding to produce a reversal. Senator Folsom, in a short opinion,- cites no case. He does remark that the word surety is not appended to West-fall’s name, and that the amount to be paid was directed to be charged to his account as well as that of his co-drawers. He does not claim that Suydam & Co. did not know that Westfall was surety, and I think I have shown that this was all that could be made material. He says that Westfall did not sign the bill to give credit to the bank, but to meet the conditions of the letter of credit which he must be presumed to have seen, and to inspire confidence in the drawees; and that payment was made without funds, relying for repayment, in case of the default of the firm, on the faith of the co-drawers. I do not know why it should be presumed that Westfall had seen the letter of credit. The case discloses nothing from which such inference could be drawn. I agree that Westfall signed to give the paper credit with the drawees, and the only way he could be made liable, in an action by the acceptors, was, by regarding him as a joint drawer of the bill, and liable, whether he was surety or not, and whether his being surety was known to the acceptors or not, for money paid to their use. Griffith v. Reed, was of necessity overruled. I cannot distinguish, in principle, the case under consideration from Suydam & Co. v. Westfall, and I do not think that that case should be overruled. We must, I think, hold, that all the drawers of the bill, in this case, were jointly liable to Hicks and Hatha» *546 way, upon the payment of the bill, for money paid to their use.
It remains to consider the relations between the defendant, Joseph Garlinghpuse, who signed the bill adding surety to his name, and the plaintiff, Wright, 'who signed the bill adding to his name “ surety for the above surety,” without the knowledge or privity of the defendant, but at the instance, as I infer, of Leman B. Garlinghouse, for whose benefit it was discounted by Lester. It is argued that there was no contract, express or implied, or privity, between the plaintiff and defendant ; that the defendant does not stand in the relation of principal to the plaintiff, and that the relation of principal and surety cannot- arise except by mutual arrangement, or upon request. It is undoubtedly true, as a general rule, that no one can make himself the creditor of another, without his consent or against his will But when one is compelled to do for another what such other ought to have dene, and was bound by law to do, the law will imply not only a previous request to do the thing, but a promise to pay for doing it. (2 Parsons on Cont., 392.)
In Pownal v. Ferrand, Lord Testerden states it as a general principle, that one man, who is compelled to pay money which another is bound by law to pay, is entitled to be reimbursed by the latter. In Exall v. Partridge (8 Term, 308,) three lessees had covenanted to pay rent, and two of them had assigned the lease to the other; the plaintiff’s carriage ’ was upon the premises and the landlord distrained it for rent, and the plaintiff paid the rent and sued all the lessees for money paid to their use, and it was held that he could recover; that as- all the defendants were liable upon their covenant to pay the landlord, and as the payment by the plaintiff was $ compulsory, the law implied a promise by all the defendants to pay him. In this case the plaintiff was liable to Hicks & Hathaway for a demand which it was the duty of the defendant to pay. The plaintiff paid the debt, not voluntarily, but in consequence of a legal liability, and the law implies a promise by the defendant to reimburse the plaintiff. *547 If it should be held that the plaintiff could not, by his own act, make himself surety for.the defendant who was a surety, then the plaintiff and defendant were co-sureties, and the plaintiff can only recover the one-half of the amount he paid. It is not necessary that there should be any contfact and communication between co-sureties, from which to imply a promise to contribute. ' The right to> contribution rests upon the clearest principles of natural justice. It was early established as a doctrine of equity. (1 Story’s Eq., § 493; Dearing v. The Earl of Winchester, 2 Bos. & Pul., 270.)
The principal may obtain any number of sureties, and those who first become sureties may not know that others are also to become sureties, and the doctrine of contribution applies to all co-sureties, and this, too, whether they became so upon the same or divers obligations, and at different times. They must, of course, be sureties for the same debt or demand, and for the same principal., In this case, however, the.question is, can'one become,surety for one who has'already become surety? I have found no case like this. It is well settled that a co-surety may, by his contract, qualify the extent of his liability. (Dearing v. The Earl of Winchester, supra; Craythorne v. Swinburne, 14 Ves., 160.) In the latter case, the defendant applied to a bank for money, for his nephew, upon a bond executed by the nephew and the plaintiff, who was surety. The bank declined to advance the money without further security, and thereupon the defendant executed to the bank his bond, by the condition of which, as construed, he became surety for his nephew and the plaintiff, the surety of the nephew. The plaintiff was obliged to pay the bank, and he then "filed his bill against the defendant, claiming that he, by his bond to the bank, became a co-surety, and that he was therefore liable to contribute. The Chancellor held that the defendant became the surety of both the parties to the other bond; that he was a surety for the surety of the nephew, and for the nephew, and with this construction of the bond dismissed the bill. The case is interesting and instructive upon the doctrine of surety-ship and contribution. It was fully argued and much con *548 sidered, and it is nowhere intimated that the defendant could not become surety for a surety without the latter’s consent. Had the defendant been compelled to pay the bank, and had then sued the plaintiff for the whole debt and recovered, the case would have been precisely in point.
If it is necessary to show the assent of the defendant to the plaintiff’s becoming surety in the manner he did, it seems to me that such assent may be implied. Leman B. Grarlinghouse desired to raise money, and he drew and signed the bill, and took it to Joseph, the defendant, and he signed, adding surety to his name, and then Leman took it to the plaintiff, who signed it, adding “ as surety for the above surety.” The object of making the bill was to raise money, and the defendant signed it to enable Leman to raise money upon it, and Leman had a right to negotiate it as it then was, if he could, or to procure any additional names. The bill was still in his hands with the right to procure other sureties, and, as I think, an implied authority from Joseph to obtain additional security in any form which should not increase or change his liability upon the paper. If no additional name had been obtained by Leman, the defendant would have been liable, as sole surety, for the whole debt, and had he paid it, would' have had no one but his principal to resort to for reimbursement. He has not been injured, therefore, by his principal’s procuring the plaintiff to become his surety, and I think, the authority of the principal to strengthen the paper, by procuring a surety, for Ms surety, the defendant, may be implied. In Craythorne v. Swinburne (supra), the defendant was acting as the agent of his nephew in procuring the money from the bank, and, if the question I am considering is doubtful upon general principles, it may be that it was not raised in that case for the reason that the principal had the right to give additional strength to the bond, by procuring another surety for himself, .and his surety. My attention has been called to Warner v. Price (3 Wend., 397.) The principal made a note and procured three sureties to sign it. It not being satisfactory to the bank, he took it to the plaintiff, who signed the note adding “ surety ” *549 to his name. He paid the note, and sued the principal and the three prior sureties. It was held that he was a co-surety for the principal, and this was so held from facts and circumstances stated, showing that he must have so understood when he signed the note. The judge, it is true, remarks, in connection with the mode of signing, that they must all be considered co-sureties unless a state of facts be shown from which it shall appear positively, or by legal intendment, that the defendants intended, as to the subsequent signer, to stand in the character of principals. It is not intimated that the relation of principal and surety could not be established between sureties of a common principal, but the contrary is to be inferred from the opinion requiring it to appear, either by legal intendment or positively, that such sureties intended to stand as principals gs to other sureties. This remark was not necessary to the decision, and if sound, I think I have shown, -in this case, an implied authority from the defendant to Leman, the principal, to strengthen the paper in any way necessary to enable him to raise money, which should not injuriously affect the defendant, and that the case is brought within the remark of the judge in Warner v. Price. In all other respects the case is, inferentially, an authority for the positions I have taken.
This is'not the case of one signing a note as the surety of the maker, without his consent or knowledge, and thus attempting to establish the relation of principal and surety. In such a case, the note having become operative as a note, the liability of the maker cannot be changed. But suppose A lends his note»to B, to enable the latter to raise money upon it, may not B procure an additional signer before using the note ? and may he not procure such additional signer as surety for A, thus making the note stronger, so as to enable him to accomplish the object for which A signed it, to wit, the raising of money upon it? It seems to me that he may, and that such authority may well be implied.
Upon the whole, I think the case was properly decided by the Supreme Court, and that the judgment should be affirmed.
*550 Emott, J., also dissented; Selden, J., did not sit .in the case.
Judgment reversed, and new trial ordered.